[Sac. No. 3772. In Bank.—March 31, 1927.]

W. C. COLLEY, Respondent, v. THE CHOWCHILLA NATIONAL BANK (a Corporation), Appellant.

THE CHOWCHILLA NATIONAL BANK (a Corporation), Appellant, v. HOPE L. COLLEY et al., Respondents.

[1] CONTRACTS — CONSIDERATION — CHARACTER OF. — Under ordinary circumstances a conveyance of property to a third party by the releasee in consideration of the release of certain obligations by the releasor would be a sufficient consideration, as it implies detriment to the releasee.

[2] ID.—PROMISSORY NOTE — CANCELLATION—NATIONAL BANK—ULTRA VIRES ACT.—Where a national bank took an assignment of a contract to purchase property as security for a promissory note held by it, its agreement thereafter made to cancel the obligation on the note in consideration of the transfer by the maker of the note of the property covered by the contract of purchase

to a party not shown to have any other connection with the transaction is in legal effect the making of a gift of its capital assets by the bank, beneficial only to the third party and without benefit to itself, and the contract is *ultra vires* and void.

[3] ID.—CORPORATIONS—ULTRA VIRES ACT—DEFINITION OF.—The acts of a corporation may be said to be *ultra vires* in different senses: first, when the act is not within the scope of the powers of the corporation to perform under any circumstances, or for any purpose, in which case the act is void *in toto* and the corporation may avail itself of the plea; or in the second case, an act is sometimes *ultra vires* with reference to the rights of certain parties when the corporation is not authorized to perform it without their consent, or with reference to some specific purpose when it is not authorized to perform it for that purpose although fully within the scope of the general powers of the corporation, with the consent of the parties interested, or for some other purpose, and in the latter case the right of the corporation to avail itself of the plea will depend upon the circumstances of the case.

[4] ID.—NOVATION—DEFINITION—PLEADING. — Under section 1530 of the Civil Code, novation is a substitution of a new obligation for an existing one, made as provided by section 1531 of said code, and it must be pleaded either expressly or by unequivocal implication.

[5] ID.—INSUFFICIENT SHOWING OF NOVATION.—Where the only thing shown is that a bank, after accepting a quitclaim deed, asserted in an action brought by it the right to possession of the premises covered by the deed, which was consistent with its rights under the terms of a certain contract of sale, the facts do not show a novation under which said bank agreed to pay the obligation of certain notes held by another bank and secured by a contract of purchase of said property, the obligations of which notes the latter bank agreed with the makers thereof would be canceled in consideration of the execution by the makers of said notes of said deed of the property to the first mentioned bank.

[6] ID. — FINDINGS — INSUFFICIENCY OF EVIDENCE. — In this action it is held that the evidence was insufficient to sustain the findings.

[7] ID. — ASSIGNMENT OF CONTRACT TO PURCHASE LAND — INTERESTS OF ASSIGNEE.—The assignment of a contract to purchase real property gives the assignee an equitable lien or mortgage upon said real property, enforceable against the property in the hands, not only of the original contractor, but also in the hands of his

3. See 7 Cal. Jur. 53; 7 R. C. L. 673.
4. See 20 Cal. Jur. 250, 258; 20 R. C. L. 367.
7. See 17 Cal. Jur. 734.

heirs, administrators, executors, voluntary assignees and purchasers, or encumbrancers with notice, actual or constructive.

[8] ID. — NATIONAL BANKS — TAKING OF SECURITY FOR UNSECURED DEBT—ESTOPPEL.—A national bank would be estopped to deny its power, in getting security for a pre-existing, unsecured debt, to make a valid agreement to release the debtors from personal liability where they had in good faith executed a contract to their detriment by which they transferred property to a third party, as a national bank may lawfully do many things in securing and collecting its loans, in the enforcement of its rights and the conservation of its property previously acquired, which it is not authorized to engage in as a primary business.

(1) 34 Cyc., p. 1050, n. 40, 43.   (2) 7 C. J., p. 832, n. 66 New. (3) 7 C. J., p. 784, n. 82, 88, 89, p. 833, n. 80; 14a C. J., p. 307, n. 71, 73, p. 308, n. 77.   (4) 29 Cyc., p. 1130, n. 3, p. 1131, n. 12, 14, p. 1132, n. 19, p. 1134, n. 24, p. 1136, n. 38, p. 1139, n. 63. (5) 7 C. J., p. 526, n. 50, p. 783, n. 78; 29 Cyc., p. 1139, n. 63, 68. (6) 7 C. J., p. 757, n. 53; 29 Cyc., p. 1139, n. 68.   (7) 39 Cyc., p. 1673, n. 4, 5.   (8) 4 C. J., p. 650, n. 37; 7 C. J., p. 807, n. 25, p. 811, n. 56, p. 834, n. 81; 14a C. J., p. 252, n. 11.

APPEAL from a judgment of the Superior Court of Madera County. E. N. Rector, Judge. Reversed.

The facts are stated in the opinion of the court.

W. M. Conley, Matthew Conley, Philip Conley, Lindsay & Conley for Appellant.

Faucett & Ring, in Stead and Place of John W. Maloy, Deceased, and Lee D. Windrem for Respondents.

PRESTON, J.—By a stipulation of the parties the above-entitled causes were heard together in the court below, and while separate judgments were entered in each case and separate notices of appeal filed, still a consolidated record on appeal was prepared and the causes have been carried on our calendar under one number. They will, therefore, be considered and disposed of as one case.

This is appropriate, for the same basic questions underlie them and a determination thereof will guide our action in both causes. They will be known herein as cause one and cause two, respectively, following the order appearing in the caption. From the record it appears that the Los

Angeles Trust & Savings Bank was succeeded by the Pacific Southwest Trust & Savings Bank and they are in reality one; hence reference herein will be made to them as the "Los Angeles bank."

The amended complaint in cause one was by stipulation of the parties made the answer to the complaint in cause two and the court in its findings of fact and conclusions of law adopted said amended complaint as its findings of fact without any other material findings whatsoever. It is, therefore, necessary to briefly set forth the allegations of said amended complaint as follows:

That on the twenty-first day of September, 1921, plaintiff, W. C. Colley, was indebted to the Chowchilla National Bank in the sum of $5,300, evidenced by his promissory note, which, with accrued interest thereon, amounted on the fifteenth day of April, 1922, to the sum of $5,441.45; that at the same time he was also indebted to said bank as indorser upon a promissory note in the principal sum of $2,728, with interest, which said latter indebtedness, after deducting partial payments, amounted on the fifteenth day of April, 1922, to the sum of $1,615.37, said indebtedness totaling on that date the sum of $7,056.82.

That on the first day of May, 1920, Hope L. Colley, on behalf of herself and husband, entered into a written contract of sale and purchase with the Los Angeles Trust & Savings Bank, a corporation, touching eighty acres of real property situate in the county of Madera, state of California, whereby the agreed purchase price of $18,000 was payable in installments covering a period of years and containing the usual covenants.

That on said fifteenth day of April, 1922, a refunding arrangement was entered into between said W. C. Colley and Hope L. Colley, his wife, and the said bank, whereby said indebtedness of W. C. Colley to appellant was subdivided by the execution of five promissory notes, as follows: One for the principal sum of $500, payable November 1, 1923; another for the principal sum of $1,500, payable November 1, 1924; another for the principal sum of $1,500, payable November 1, 1925, said three above-mentioned notes being signed by Hope L. Colley and indorsed by W. C. Colley; a fourth note in the sum of $1,500, due November 1, 1926, and a fifth in the principal sum of $2,059.75, payable

November 1, 1927, said two last-mentioned notes being executed by W. C. Colley and indorsed by Hope L. Colley; that interest provided for in said notes was eight per cent; that to secure the payment of said notes and each of them said Hope L. Colley made, executed and delivered to said bank an assignment of said contract of sale and purchase above referred to, said assignment being subordinate to a previous assignment which had been made by her to one A. F. Witesman.

Said amended complaint then further provides:

"That after said delivery of said second assignment of contract (meaning the assignment to defendant bank above described) to said defendant and on or about the 22nd day of April, 1922, the said defendant notified said plaintiff that if, at any time before payment of said five new promissory notes, said plaintiff and said Hope L. Colley, his wife, would execute a quitclaim deed of the said real property to Pacific Southwest Trust & Savings Bank, a corporation (formerly the said Los Angeles Trust & Savings Bank, a corporation), the same would operate in full payment of all of the aforesaid indebtedness of said plaintiff to said defendant and that concurrently with the execution of such quitclaim deed by said plaintiff and said Hope L. Colley, the said defendant would thereupon deliver up and surrender to said plaintiff all of the said promissory notes by the terms thereof payable to said defendant as aforesaid; that thereafter and on February 24th, 1923, said plaintiff and said Hope L. Colley executed to said Pacific Southwest Trust & Savings Bank, a corporation, their quitclaim deed of all of said real property, and same was on last said date acknowledged and certified so as to entitle same to be recorded, and the same was on February 27, 1923, recorded in the Office of the County Recorder of the county of Madera, State of California, in Vol. 3 of 'Official Records,' at page 16."

The amended complaint further alleges that at the time said quitclaim deed was made the property covered by said contract was of the reasonable value of $64,000, and the amount due on account of the purchase price thereof, including interest, was not to exceed the sum of $30,000; and that said respondent, Hope L. Colley, owned an equity in said real property which was far in excess of the claims

of said bank; that after the execution of said quitclaim deed the Colleys made demand upon defendant bank to surrender and deliver up to them the two notes first described in said amended complaint, and also the five notes executed later in lieu of said two first-mentioned notes; but that said bank refused to surrender or deliver up any of said notes or to acknowledge payment of all or any or either of them; that, however, no payment had been made on account of said indebtedness except by the execution of said quitclaim deed; that the respondents were not informed as to whether any of said notes had been negotiated; that defendant claimed none of said notes had been paid or in any manner discharged; that great and irreparable damage would be suffered should said notes remain outstanding.

The prayer of said amended complaint was that defendant bank be ordered to deliver up said notes and each of them; that in case it failed to deliver them up, plaintiff have judgment for the principal sum mentioned therein, with interest thereon from and after the fifteenth day of April, 1922, and for general relief.

As above stated this amended complaint was by stipulation of the parties made the answer to the complaint in cause two, which said cause is an action to recover from the Colleys the principal and interest of one of the five promissory notes involved in cause one and interest on two other of said notes.

The court found that all of the allegations of said amended complaint were true and that all of the allegations of the answer of defendant bank were untrue except that defendant bank was a national institution organized under and by virtue of the laws of the United States of America, with its principal place of business at Chowchilla, in the county of Madera, state of California.

Accordingly, in cause one, pursuant to said findings, the court gave judgment in favor of the plaintiff, W. C. Colley, to the effect that said note for $5,300, dated September 21, 1921, be adjudged and declared canceled and no longer an obligation of said plaintiff; that the note in the principal sum of $2,728, bearing the same date, be likewise adjudged and declared canceled and no longer an obligation of said plaintiff, either in whole or in part; and as to the later notes it was adjudged that said defendant bank be ordered and

required to deliver up each of said five promissory notes set forth in said amended complaint, or in case delivery of any of said promissory notes could not he had, that plaintiff recover from said defendant the principal sum named therein, together with interest on said sum from April 15, 1922, to date of judgment.

In cause two the court likewise adopted the allegations of said amended complaint as its findings and adjudged each of said notes sued upon in said cause two to have been paid and discharged in full and gave judgment for the defendants accordingly. The appeal in cause one is by defendant bank from the judgment in favor of plaintiff and in cause two by plaintiff bank from the judgment in favor of defendants therein.

[1] It is clear from the foregoing that the legal effect of these findings is that the indebtedness to the appellant has been satisfied by the execution of the quitclaim deed to the Los Angeles bank, and that respondents should have a release therefrom in the form of surrender of both said series of notes (*Epstein* v. *Gradowitz*, 76 Cal. App. 29 [243 Pac. 877]). Indeed, the findings declare the obligation released upon a new consideration which complies with the provisions of section 1541 of the Civil Code. It is also to be noted that the consideration set forth is not one of specific benefit to appellant, but is one implying only detriment to the respondents. Undoubtedly, under ordinary circumstances, a consideration of this type is sufficient (Civ. Code, sec. 1605).

In 34 Cyc. 1050, the rule is stated as follows: "A consideration for a release moving from a third person on behalf of the releasee, to the releasor or from the releasee to a third person at the request or by the acquiescence of the releasor is as adequate as a consideration moving directly from the releasee to the releasor." (To the same effect see *Midland Trust & Sav. Bank* v. *Nagle*, 150 Minn. 279 [184 N. W. 1028], and *Gates* v. *Fauvre*, 74 Ind. App. 382 [119 N. E. 155].)

In *Rucker* v. *Bolles*, 80 Fed. 504, 513 [25 C. C. A. 600], it is said: "If one party to a contract agrees to release the opposite party therefrom in consideration of his doing some act which he is under no obligation to do, the doing

of that act is a sufficient consideration for the release, altho
it was not beneficial to the first party.''

[2]   But notwithstanding the above set forth principle,
we must here deal with a corporation whose powers are cir-
cumscribed by the statutes of the United States.    In short,
we have as the alleged releasor a national banking associa-
tion which has in practical effect agreed to give a satisfac-
tion of the debt without special benefit of any kind to itself.
The legal consequence of the promise as found by the court
is that the corporation has covenanted to make a gift of its
capital assests for the doing of an act, detrimental to the doer,
it is true, but without benefit to itself, and beneficial only
to a third party, whose connection, if any, with appellant
does not appear from the record.    In other words, may a
national bank under its powers as defined by the law be held
to such a covenant?    Appellant insists that such a contract,
if proved, would be *ultra vires* the power of the corporation,
and we think this contention must be sustained.    We must
look to the statutes of the United States as construed by the
supreme court of the United States for a determination of
this question.    (*Chemical National Bank* v. *Havermale,* 120
Cal. 601, 603 [65 Am. St. Rep. 206, 52 Pac. 1071].)

[3]   In the early California case of *Miners' Ditch Co.* v.
*Zellerbach,* 37 Cal. 543, 578, 579 [99 Am. Dec. 300], our
court, speaking of the doctrine of *ultra vires* as applied to
corporations, held: ''The term *ultra vires,* whether with
strict propriety or not, is also used in different senses.    An
act is said to be *ultra vires* when it is not within the scope of
the powers of the corporation to perform it under any cir-
cumstances, or for any purpose.    An act is also, sometimes,
said to be *ultra vires* with reference to the rights of certain
parties when the corporation is not authorized to perform
it without their consent; or with reference to some specific
purpose when it is not authorized to perform it for that
purpose although fully within the scope of the general
powers of the corporation, with the consent of the parties
interested, or for some other purpose.    And the rights of
strangers dealing with corporations may vary, according as
the act is *ultra vires* in one, or the other, of these senses.
All these distinctions must be constantly borne in mind in
considering a question arising out of dealings with a cor-
poration.    When an act is *ultra vires* in the first sense

mentioned, it is generally, if not always, void *in toto*, and the corporation may avail itself of the plea. But when it is *ultra vires* in the second sense, the right of the corporation to avail itself of the plea will depend upon the circumstances of the case.''

This definition of *ultra vires* and this classification of the types thereof was adopted by the supreme court of the United States in the case of *National Bank & Loan Co.* v. *Petrie,* 189 U. S. 423 [47 L. Ed. 879, 23 Sup. Ct. Rep. 512, see, also, Rose's U. S. Notes].

We think that the agreement here involved comes clearly under the first subdivision of the subject and is *ultra vires* in the first or proper sense. In *Central Transp. Co.* v. *Pullman Car Co.,* 139 U. S. 24, 59 [35 L. Ed. 55, 11 Sup. Ct. Rep. 478, see, also, Rose's U. S. Notes], the supreme court of the United States said: ''A contract of a corporation, which is *ultra vires,* in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection of the contract is, not merely that the corporation ought not to have made it, but that it could not make it.'' See, also, to the same effect: *Union Pacific Ry.* v. *Chicago etc. Ry.,* 163 U. S. 564 [41 L. Ed. 265, 16 Sup. Ct. Rep. 1173], and *California National Bank* v. *Kennedy,* 167 U. S. 367 [42 L. Ed. 198, 17 Sup. Ct. Rep. 831].

The power of a national bank to deal in shares of stock or shares in a partnership was before the supreme court of the United States in the following cases: *National Bank of Ottawa* v. *Converse,* 200 U. S. 425 [50 L. Ed. 537, 26 Sup. Ct. Rep. 306], and *Merchants National Bank* v. *Wehrmann,* 202 U. S. 295 [50 L. Ed. 1036, 26 Sup. Ct. Rep. 613]. In the latter case the court said: ''It is not necessary in this case to say that shares like the present could not be accepted as security in any form by a national bank. But such a bank cannot accept an absolute transfer of them to itself. It recently has been decided that a national bank cannot take stock in a new speculative corporation, with °the common double liability, in satisfaction of a debt. (*First National Bank of Ottawa* v. *Converse,* 200 U. S. 425 [50 L. Ed. 537,

26 Sup. Ct. Rep. 306].)  *A fortiori,* it cannot take shares in a partnership to the same end.''

The rule as laid down in 7 Corpus Juris, page 784, is as follows: ''The officers of a national bank cannot bind it by contracts or acts which are not within the scope of the business which the bank is authorized to transact, such as . . . agreeing to receive anything but money in payment of a non-negotiable note endorsed to the bank, or making donations to a charity or to public or private enterprises.''

The reason for the rule is found in *McCormick* v. *Market National Bank,* 165 U. S. 550 [41 L. Ed. 817, 17 Sup. Ct. Rep. 433], as follows: ''The doctrine of *ultra vires* by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: the obligation of anyone contracting with a corporation, to take notice of the legal limits of its powers; the interest of the stockholders, not to be subject to risks which they have never undertaken; and above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law.''

[4]  Respondents, however, practically conceding the force of the above authorities, vigorously contend that the pleadings, proof, and findings warrant the conclusion that respondents are entitled to the relief given them by the court because of a novation of the contract wherein and whereby respondents were released from their obligation to appellant and a new contract was made between appellant and the Los Angeles bank, whereby said latter bank assumed and agreed to pay the indebtedness of respondents to appellant.

We have been cited to no evidence nor can any be found to sustain this contention of respondents. The legal principles comprising the doctrine of novation as far as the same are here involved may be stated as follows:

Civil Code, section 1530: ''Novation is the substitution of a new obligation for an existing one.''

Civil Code, section 1531: ''Modes of novation: Novation is made: 1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation; 2. By the substitution of a new debtor in place of the old one, with intent to release the latter; or, 3. By the substitution of a new creditor in place of the old one, with

intent to transfer the rights of the latter to the former."

In 20 Cal. Jur., page 250, it is said: "But when it is clear that a new contract has been entered into without fraud and upon the understanding and with the intent that it shall be substituted for a former one, a novation is affected and the former agreement is extinguished. For example, it is said that where a bank to which checks on another bank are sent for collection, accepts credit from the drawee bank instead of requiring payment, such acceptance of the obligation of the drawee bank in discharge of the check amounts to novation between the two banks."

Novation must be pleaded either expressly or by unequivocal implication (*Trabucco* v. *Collins*, 39 Cal. App. 412 [179 Pac. 221]; *McGinn* v. *Willey*, 24 Cal. App. 303 [141 Pac. 49]; 20 Cal. Jur. 258; *People's State Bank* v. *Penello*, 67 Cal. App. 103 [227 Pac. 190]; *Anglo-California Trust Co.* v. *Wallace*, 58 Cal. App. 625 [209 Pac. 78]). The amended complaint is wholly deficient in this regard. The burden of establishing a novation is upon the party asserting its existence (*Anglo-California Trust Co.* v. *Wallace, supra, Robinson* v. *Rispin*, 33 Cal. App. 536 [165 Pac. 979], *Brown* v. *Coffee*, 17 Cal. App. 381 [121 Pac. 309], and *Linder Hardware Co.* v. *Pacific Sugar Corp.*, 17 Cal. App. 81 [118 Pac. 785]).

In 20 Ruling Case Law, at page 367, we find the following rule announced: "An essential element of every novation is a new contract to which all the parties concerned agree . . . It is essential then, in order to constitute a novation, by which the original debtor is released, the creditor being bound thereby to discharge the debt as to him and look to another for the payment of his demand, that a contract be made between the new debtor and the creditor by which the claim can be enforced against such new debtor, and if the new debtor enters into no contract with the creditor by which he becomes the debtor of the creditor, so that the creditor may maintain an action against him, there is not a novation."

In 29 Cyc., at page 1136 and page 1139, the rule is again stated: "The most frequent novation is the substitution of a new debtor. To constitute this kind of a novation, there must be a mutual agreement among three parties, the creditor, his immediate debtor and the intended new debtor,

by which the liability of the last named is accepted in the place of the original debtor in discharge of the original debt. . . . The burden of proof rests upon him who asserts that there has been a novation to establish it.''

While it is true that a novation may be established by implication, nevertheless ''such implication cannot arise until there is evidence showing facts and circumstances from which it may reasonably be inferred that such was the intention.'' (20 Cal. Jur. 258, *People's State Bank* v. *Penello, supra,* and *Anglo-California Trust Co.* v. *Wallace, supra.*)

[5] A discussion to be made later herein of the evidence will disclose that the record contains no facts whatsoever from which it can be said that a new contract was made between the Los Angeles bank and appellant for payment of said indebtedness, with the intention of releasing and discharging the old obligation existing on the part of respondents or any agreement whatsoever to assume or pay the same.

Respondents also insist that under the principle announced in section 1589 of the Civil Code, the Los Angeles bank, having accepted the quitclaim deed, must be held to have assumed and agreed to pay and satisfy the indebtedness to appellant. The only thing shown by the record is that said bank, after accepting said quitclaim deed, asserted in an action brought by it the right to possession of said premises, but this is consistent with its rights under the terms of the contract of sale. It might have otherwise caused to be forfeited the rights of the respondents by declaring them in default and taking proceedings under the terms of the contract for that purpose and thus get possession of the land. There was nothing done by it that was not in strict accord with the enforcement of the contract, and this without reference of any kind to the claim of appellant bank for the indebtedness of respondents to it. The evidence shows nothing compelling the conclusion that the said bank assumed or agreed to pay any portion of this indebtedness of the respondents to appellant. The respondents were on the verge of insolvency, having made at least three assignments of said contract of sale and purchase as security for large amounts of indebtedness, and they were, as above noted, in default upon their payments under the contract itself. No reason whatsoever is shown by the record for an

independent promise of payment of their indebtedness to appellant by the Los Angeles bank.

In the foregoing and subsequent discussions we have assumed that action by the several presidents of the appellant bank was in each case action by the bank itself, for we conclude that the president and such officers who acted herein had actual or ostensible authority to bind the bank in every way that it could be bound under the law. (4 Cal. Jur. 158; *Jennings* v. *Bank of California*, 79 Cal. 323 [12 Am. St. Rep. 145, 5 L. R. A. 233, 21 Pac. 852]; *Burnell* v. *San Francisco Savings Union*, 136 Cal. 499 [69 Pac. 144]; *Carpy* v. *Dowdell*, 115 Cal. 677 [47 Pac. 695]; *Newton* v. *Johnston Organ etc. Mfg. Co.*, 180 Cal. 185 [180 Pac. 7], and *Bartlett Est. Co.* v. *Fraser*, 11 Cal. App. 373 [105 Pac. 130].)

[6] Appellant further insists that the findings hereinabove discussed are without support in the evidence, and we agree also with that contention. The most that can be claimed under the evidence is that the appellant bank, in order to get security for the pre-existing loan made to respondent W. C. Colley, promised the respondents that if the new notes were executed by them and the contract of sale and purchase assigned as security therefor, that if and when the land covered by said contract was sold, the bank would look to the purchase price received for payment of the loan, and if it became necessary on account of untoward circumstances for respondents without a sale to quitclaim or release their equity back to the legal owner, that appellant should and would release respondents from personal liability on said notes. And that after said new notes were executed and the security given this promise was renewed and was relied upon when the quitclaim deed was executed and delivered.

There is no evidence that the bank agreed to cancel the indebtedness outright, nor is there any evidence that it promised to release or forego the security afforded by the assignment of the contract. [7] The assignment of this contract gave the appellant an equitable lien or mortgage upon said real property, enforceable against the property in the hands not only of the original contractor, but also in the hands of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice, actual or constructive (17 Cal. Jur. 734, secs. 38–40; *Title Ins. & Trust*

*Co.* v. *California Dev. Co.,* 171 Cal. 173 [152 Pac. 542]). And no excuse can be found in the evidence for making the improvident promise to forego this security. Neither does the evidence fix any date or other time for the surrender to respondents of said notes, and the most favorable deduction that could be made from it in behalf of respondents is that said notes would be returned to them when and not until the security given for them had been realized upon. In short, giving the evidence the fullest weight, it amounts to no more in legal effect than a waiver by appellant bank of its claim for a deficiency judgment after a foreclosure or satisfaction of the equitable lien or mortgage given it by the assignment of the real estate contract.

Neither is there any evidence whatsoever that the Los Angeles bank assumed or agreed to pay or to become personally liable or liable in any other way for said indebtedness. There is likewise no evidence whatsoever of a substitution of the said bank in the place and stead of the respondents with intent to release them from the obligation of their notes.

The evidence further shows that the respondents were in default both to the Los Angeles bank and upon their other obligations; that they were threatened with and were themselves threatening bankruptcy at the time said quitclaim deed was executed. It is true that at the time said deed was made it was done on the advice and at the instigation of Mr. Witesman, the then president of appellant bank, but, as above pointed out, nothing was said or done by any representative of appellant which indicated an intention to release and satisfy said indebtedness. On the contrary, the clear inference is that appellant bank in so advising said quitclaim deed did not intend to satisfy said indebtedness, but doubtless thought that its rights would remain *in statu quo* or probably be benefited by execution thereof. There is, not one word of evidence that at the time of making the deed, or any other time, appellant promised to forego and surrender the security given it by the execution of said assignment.

Summing up the whole situation, the inference is clear that at most the bank was moving in its own interests in trying to get security for its obligation and later to realize upon it, and was not in any sense intending to satisfy said indebtedness altogether, but was willing to release respondents from

personal liability only upon said notes and surrender them only when said security had been exhausted. Had the court made findings and given judgment in accord with this construction of the effect of the evidence, we would have been constrained to hold that such an agreement would have been within the power of the appellant to make, for in our opinion such an act on the part of appellant would have been at most *ultra vires* under the second subdivision of the doctrine announced in *Miners' Ditch Co.* v. *Zellerbach, supra,* and the appellant in such event would have been estopped from setting up this defense. This observation is also pertinent in the consideration of the appeal in cause two, for, as we have observed, the court found said notes sued upon had been paid and gave judgment accordingly for respondents, who were defendants in the court below in cause two. The defense that the bank had waived personal liability of defendants on the notes was not made. Neither was the defense that an independent action would not lie under section 726 of the Code of Civil Procedure made. On the contrary, the court took the broad ground that said notes, by the execution of said quitclaim deed to a third party, had been thereby paid.

[8] As the cause may be retried, we feel called upon to say that under the general powers of the appellant as a national banking corporation, and under Revised Statutes of the United States, section 5136, which grants "all such incidental powers as shall be necessary to carry on the business of banking," and section 5137, which confers the power to take, hold and convey real property mortgaged to secure a pre-existing indebtedness, together with the right to convey or expose same to sale and purchase it thereat, appellant would be estopped to deny its power, in getting security for a pre-existing, unsecured debt, to make a valid agreement to release the respondents from personal liability on same where they had in good faith executed to their detriment their covenants under such a contract. (See *Ohio & Mississippi Ry. Co.* v. *McCarthy,* 96 U. S. 258 [24 L. Ed. 693].) In *Morris* v. *Third Nat. Bank of Springfield, Mass.,* 142 Fed. 25 [73 C. C. A. 211], the court said: "A national bank may lawfully do many things in securing and collecting its loans, in the enforcement of its rights and the conservation of its property previously ac-

quired, which it is not authorized to engage in as a primary business.''

In *First Nat. Bank* v. *National Exch. Bank*, 92 U. S. 122 [123 L. Ed. 679], the court said: `` . . . Authority is thus given to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter. . . . This necessarily implies the right of a bank to incur liabilities in the . . . course of its business as well as to become a creditor of others. Its own obligations must be met and debts due to it collected or secured. The power to adopt reasonable and appropriate measures for these purposes is an incident to the power to incur the liability or become the creditor. Obligations may be assumed that result unfortunately . . . Compromises to avoid or reduce losses are oftentimes the necessary results. . . . These compromises come within the general scope of the powers committed to the . . . directors and officers, . . . and are submitted to their judgment and discretion, except to the extent that they are restrained by the charter. . . . Banks may do, in this behalf, whatever natural persons could do under like circumstances.'' (See, also, *Second Nat. Bank* v. *United States Fidelity & Guar. Co.*, 266 Fed. 489.)

In *Tecle* v. *Rockport Granite Co.*, 224 Mass. 20, 25 [112 N. E. 497], it was said: ``Whatever transactions are fairly incidental or auxiliary to the main business of the corporation and necessary or expedient in the protection, care and management of its property, may be undertaken by the corporation and be within the scope of its corporate powers.'' (See, also, 14a C. J. 252.) It was this principle that the court had in mind in the case of *James Eva Estate* v. *Oakland B. & M. Co.*, 40 Cal. App. 515 [181 Pac. 415].

We deem it unnecessary to consider the further point raised by appellant that because the covenants claimed were not contained in the contemporaneous written instruments, evidence in respect thereto would be inadmissible, for we have held, treating the evidence as admissible, that it is insufficient to support the findings.

The judgment of the court in cause one in declaring the notes paid and in ordering them to be delivered up for

cancellation is clearly in excess of any relief warranted by the findings or the evidence. This observation is also true of the provisions authorizing, in case of nondelivery, a judgment against appellant bank for the principal sums mentioned in said notes with interest from the fifteenth day of April, 1922.

In cause two the judgment was to the effect that the notes had been satisfied and discharged. The said judgment is likewise, for the reasons hereinabove pointed out, clearly in excess of any relief warranted by the evidence in the case; however, upon the facts as shown by the record here presented the effect of this decision is to hold that respondents are entitled to be released from personal liability upon said obligations sued upon herein.

It therefore becomes necessary to reverse the judgment in both cases, and it is so ordered, with instructions to the court below to take such further proceedings in them as may be deemed advisable, not inconsistent with the views herein expressed.

Curtis, J., Shenk, J., Richards, J., Seawell, J., Langdon, J., and Waste, C. J., concurred.